[822 NYS2d 810]

In the Matter of CLAUDIA EE., a Mentally Retarded Person.
LAURA KK., as Guardian of CLAUDIA EE., Respondent; MEN-
TAL HYGIENE LEGAL SERVICE, Appellant, and ST. PETER's
HOSPITAL, Respondent.

Third Department, October 19, 2006

APPEARANCES OF COUNSEL

*Bruce S. Dix, Mental Hygiene Legal Service*, Albany (*John E. Dorfman* of counsel), for appellant.

*Maney, McConville & Liccardi*, East Greenbush (*Stanley B. Segal* of counsel), for Laura KK., respondent.

*Iseman, Cunningham, Riester & Hyde*, Albany (*Robert H. Iseman* of counsel), for St. Peter's Hospital, respondent.

*John F. Van Ahn*, Delmar (*Tania F. Seaburg* of counsel), for NYSARC, Inc., amicus curiae.

**OPINION OF THE COURT**

MERCURE, J.P.

In January 2006, petitioner was appointed guardian under SCPA article 17-A of her 50-year-old sister, Claudia EE. The decree and letters of guardianship directed that the guardian comply with SCPA 1750-b in the event that a decision was made to withhold or withdraw life-sustaining treatment. Claudia, a mentally retarded person with Down syndrome who resided in a community residence operated by the Center for Disability Services, suffered from Alzheimer's disease and had been admitted to respondent St. Peter's Hospital with respiratory failure and placed on a ventilator.

On February 1, 2006, the guardian provided respondent Mental Hygiene Legal Service (hereinafter MHLS) with notice pursuant to SCPA 1750-b (4) that she intended to withdraw life-sustaining treatment, specifically, Claudia's ventilator. After visiting Claudia, reviewing her medical records and speaking at length with her physicians, counsel for MHLS stated that the agency had "no objection" to the guardian's decision to "withdraw life sustaining treatment" and waived the remainder of the 48-hour notice period provided by the statute (*see* SCPA 1750-b [4] [e] [ii]). On February 3, 2006, the ventilator and a

feeding tube were removed and Claudia was transferred to the hospice care unit of the hospital. Although the parties and Claudia's doctors believed that Claudia's death was imminent, she did not die immediately. After counsel for MHLS went to the hospital several days later and observed Claudia "breathing on her own, eating on her own [and] drinking on her own," MHLS sent a letter to the guardian, the hospital and hospice unit purporting to revoke its "consent" to the withdrawal or withholding of any life-sustaining treatment and demanding that Claudia be afforded treatment.

Thereafter, Claudia was moved back to the hospital's medical unit and full medical procedures were instituted, including the readministration of oxygen to assist Claudia's breathing. After counsel for the hospital contacted Surrogate's Court seeking guidance on how to respond to MHLS's attempt to revoke consent, the court held a conference on the matter and, deeming the proceeding "a continuation of the 17-A guardianship," concluded that MHLS did not have statutory authority to withdraw its consent. The court directed that the hospital restore Claudia to her condition prior to receipt of MHLS's letter. Claudia was returned to hospice care and died of aspiration pneumonia on February 21, 2006. MHLS appeals and we now affirm.

Initially, we agree with MHLS that, despite Claudia's death, review of this matter is appropriate under the exception to the mootness doctrine because the issues raised herein are substantial, likely to recur and may typically evade review (*see Matter of M.B.*, 6 NY3d 437, 447 [2006]; *Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]). MHLS asserts that it consented only to the removal of Claudia's ventilator and, once she survived withdrawal from the ventilator, it could revoke its consent. In addition, MHLS maintains that once it refused consent, the only means by which MHLS's decision not to consent could be overridden—and the only way Surrogate's Court could acquire subject matter jurisdiction—was through commencement of a special proceeding pursuant to SCPA 1750-b (6). Thus, MHLS takes issue with the court's characterization of the hearing as a continuation of the proceeding to appoint a guardian under SCPA article 17-A. Inasmuch as these arguments raise primarily questions of statutory interpretation, "our task . . . is to ascertain the legislative intent and construe the pertinent statutes to effectuate that intent" and we turn first to the statutory text, as "the clearest indicator of legisla-

tive purpose" (*Matter of M.B., supra* at 447; *see State of New York v Patricia II.*, 6 NY3d 160, 162 [2006]).

In enacting the Health Care Decisions Act for Persons with Mental Retardation (L 2002, ch 500), the Legislature clarified that when a mentally retarded individual has been determined to lack the capacity to make health care decisions (*see* SCPA 1750 [2]), the individual's duly appointed guardian "shall have the authority to make any and all health care decisions," including "any decision to consent or refuse to consent to health care" (SCPA 1750-b [1], cross-referencing Public Health Law § 2980 [6]). The statute requires that all such decisions must be based "solely and exclusively on the best interests of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person's wishes, including moral and religious beliefs" (SCPA 1750-b [2] [a]). The statute further sets forth a detailed procedure, intended to protect the mentally retarded person and prevent an improvident decision by a guardian, that must be followed before a guardian's decision to end life-sustaining treatment for the individual may be carried out (*see Matter of M.B., supra* at 442-444). As relevant here, the individual's attending physician and a concurring physician must "determine to a reasonable degree of medical certainty and note on the mentally retarded person's chart" that the mentally retarded person has one of three conditions—a terminal condition, permanent unconsciousness or "a medical condition other than such person's mental retardation which requires life-sustaining treatment, is irreversible and which will continue indefinitely"—and that "the life-sustaining treatment would impose an extraordinary burden on such person" (SCPA 1750-b [4] [b]).

Once the requisite medical conclusions have been made, the guardian has properly expressed the decision to end life-sustaining treatment and the decision has been noted in the patient's chart, the attending physician must either "issue the appropriate medical orders or object to the guardian's decision but, in either case, the decision to end life-sustaining treatment cannot be implemented for 48 hours (SCPA 1750-b [4] [e])" (*Matter of M.B., supra* at 443). Indeed, "at least [48] hours prior to the implementation of a decision," the attending physician must notify various parties including, under the circumstances here, MHLS (SCPA 1750-b [4] [e]). The statute permits a number of parties to object to the decision, including the mentally retarded person, a parent or adult sibling, the attend-

ing physician and MHLS (*see* SCPA 1750-b [5]). That objection may be made "at any time" (SCPA 1750-b [5]) and suspends the guardian's decision "while a judicial proceeding is conducted 'with respect to any dispute arising under [SCPA 1750-b], including objecting to the withdrawal or withholding of life-sustaining treatment because such withdrawal or withholding is not in accord with the criteria set forth in this section' " (*Matter of M.B., supra* at 443, quoting SCPA 1750-b [6]).

Here, while MHLS is correct that the statute contemplates a section 1750-b (6) special proceeding in the event of an objection and suspension of the guardian's decision (*see e.g. id.* at 443; *Matter of Elizabeth M.*, 30 AD3d 780 [2006]), we agree with Surrogate's Court that MHLS failed to properly object herein. As the guardian, hospital and amicus curiae note, MHLS takes the position that its "consent" to the withdrawal or withholding of life-sustaining treatment from Claudia was required and, thus, once it revoked its consent, the guardian's decision could not be implemented. Further, MHLS asserts that the guardian was required to obtain its consent for each and every particular type of life-sustaining treatment to be withheld or withdrawn such that once Claudia survived removal of the ventilator, the full procedure set forth in SCPA 1750-b (4) had to be repeated and additional consents from MHLS obtained before any further action to implement the guardian's decision could be taken.

The statute, however, provides that it is the guardian—not MHLS—who has the right "to consent or refuse to consent to health care" (SCPA 1750-b [1], cross-referencing Public Health Law § 2980 [6]; *see* Mem of Senator Hannon in Support of NY Senate Bill S 4622B, 2002 NY Legis Ann, at 279 ["This bill clarifies that guardians of persons with mental retardation have the authority to make health care decisions, including decisions regarding life-sustaining treatment under certain circumstances"]). While the statute provides MHLS with both a right to notice of 48 hours of a guardian's decision if the patient was treated in a residential facility and standing to object to that decision (*see* SCPA 1750-b [4] [e] [ii]; [5]), it does not provide that MHLS must consent to the withdrawal or withholding of life-sustaining treatment or require the guardian or attending physician to obtain MHLS's consent before the guardian's decision in that regard can be implemented. Instead, "[i]f at the conclusion of the 48-hour period there is no objection[,] the guardian's decision to withdraw or withhold life-sustaining treatment is put into effect, without judicial involvement" (*Matter of M.B.*, 6

NY3d 437, 443 [2006], *supra*). Therefore, MHLS's initial consent to the guardian's decision to withdraw life-sustaining treatment and subsequent attempt to revoke consent once the guardian's decision had been implemented were nullities. In that regard, we note that apart from declining to lodge a formal objection to the guardian's decision, MHLS failed to serve its revocation of consent on the parties to whom notice of an objection is required under the statute (*see* SCPA 1750-b [5] [c]) and makes no attempt to explain this failure. Nor did MHLS commence a special proceeding "objecting to the withdrawal or withholding of life-sustaining treatment because such withdrawal or withholding is not in accord with the criteria set forth in" section 1750-b, as the statute expressly authorizes it to do (SCPA 1750-b [6]), even after Surrogate's Court determined that no valid objection had ever been filed. Instead, MHLS appealed, asserting that its refusal to consent suspended the guardian's decision indefinitely and that review by Surrogate's Court was "premature."

Given MHLS's failure to properly object to the guardian's decision or to exercise its authority to commence a special proceeding challenging that decision, and in light of the fact that no other party authorized to object or commence a special proceeding under SCPA 1750-b did so here, we cannot agree with MHLS's argument that Surrogate's Court erred in exercising its continuing subject matter jurisdiction under SCPA 1758 over all matters affecting the guardian. MHLS represented to the hospital that its consent to the withdrawal or withholding of life-sustaining treatment was required and informed both the hospital and hospice unit that it did not so consent in Claudia's case. In our view, MHLS's letter essentially asserted that it possessed a power that is properly reserved to the guardian—the authority to make health care decisions, including the right to refuse to consent to life-sustaining treatment. In response to the request for guidance from the hospital's counsel, then, Surrogate's Court properly exercised jurisdiction over this dispute concerning the scope of the guardian's authority (*see* SCPA 1758) and correctly rejected MHLS's argument that its consent is required prior to implementation of the guardian's decision or to specific medical procedures or practices once the guardian's decision has been successfully implemented.

We note that MHLS incorrectly characterizes the decision of Surrogate's Court as holding that the relevant parties may not modify their "1750-b posture"—i.e., object despite previous agreement with the guardian's decision—in response to changes

in the person's condition. Rather, the court concluded that MHLS failed to ever file a valid objection, choosing instead to follow a course of conduct that is not authorized by the statute in asserting that its consent must be obtained before the guardian's decision can be implemented.* As noted above, it is the guardian's—and not MHLS's—consent that is required by the statute (see SCPA 1750-b [1]). If MHLS disagrees with the guardian's decision, it remains free to object at any time and provide notice of that objection to the parties specified in the statute (see SCPA 1750-b [5]) or commence a special proceeding challenging that decision as intended by the statute (see SCPA 1750-b [6]).

Finally, there is no indication in the statute that MHLS is entitled to notice of each particular medical procedure employed in implementing the guardian's decision. MHLS is entitled to notice of and may object to the guardian's "health care decision" (SCPA 1750-b [5]), and to require that the full procedures set forth in the statute be undertaken with every change in a patient's condition would lead to the very situation that the statute was designed to ameliorate: a "lack of clear authority regarding provision of life-sustaining treatment [that] has, on occasion, obstructed the guardian's role or, worse, created catastrophic obstacles to relieving desperate health care emergencies" (Mem of Senator Hannon in Support of NY Senate Bill S 4622B, 2002 NY Legis Ann, at 279).

In sum, because Surrogate's Court had subject matter jurisdiction over this dispute concerning the guardian's authority to make health care decisions and properly rejected MHLS's arguments in that regard, an affirmance is required here. MHLS's

---

* Our decision that MHLS misreads the statute in asserting its entitlement to a power—the right to consent—that it was not granted should not be read as holding that an objection by the parties listed in SCPA 1750-b (5), including the mentally retarded person, must be made in a particular form other than "orally or in writing" (SCPA 1750-b [5] [b]). Moreover, while we reject MHLS's argument that its consent to withhold or withdraw treatment must be obtained, we note our agreement with MHLS that if we were to deem its revocation of consent to be a proper objection, that objection cannot be rejected on the ground that it was untimely made after the 48-hour notice period had expired (see SCPA 1750-b [4] [e]). On its face, SCPA 1750-b (5) provides that an objection to the guardian's decision may be made "at any time." An interpretation of the statute as providing that an objection can be made only during the 48-hour notice period or that a party is precluded from objecting if it had previously expressed support for the guardian's decision would render the phrase "at any time" superfluous and, therefore, must be rejected (see Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington, 97 NY2d 86, 91 [2001]; Rangolan v County of Nassau, 96 NY2d 42, 48 [2001]).

remaining arguments have been reviewed and are either rendered academic by our determination, lacking in merit or, to the extent that they address the procedures to be followed in a SCPA 1750-b (6) special proceeding, not properly before us in light of MHLS's failure to commence such a proceeding.

CREW III, SPAIN, MUGGLIN and ROSE, JJ., concur.

Ordered that the order is affirmed, without costs.